712 So.2d 256 (1998)
Arthur B. CHATEAU, Jr.
v.
CITY OF KENNER.
No. 97-CA-1006.
Court of Appeal of Louisiana, Fifth Circuit.
May 13, 1998.
*257 James D. Maxwell, Kenner, for Defendant/Appellant.
B. Ralph Bailey, Mandeville, for Plaintiff/Appellee.
Before GAUDIN, BOWES and DALEY, JJ.
DALEY, Judge.
The City of Kenner appeals a judgment in favor of a workers' compensation claimant, Arthur B. Chateau. Chateau was an employee at the Kenner waste water treatment plant, working the night shift at the time of his accident on June 16, 1995. The trial judge awarded Chateau full supplemental earnings benefits (SEBs) from the date of *258 the injury to September 19, 1995 for wages lost with the Jefferson Parish School Board,[1] SEBs from September 19, 1995 to the present (date of judgment July 11, 1997), and all compensation benefits from the date of injury to September 19, 1995. The judgment further ordered that the claimant was entitled to reimbursement for all psychiatric treatment and prescriptions, and further awarded $2,000.00 penalties for the employer's failure to timely pay compensation due and to an additional $2,000.00 in penalties for the employer's failure to pay for necessary medical treatment. Finally, the judgment awarded claimant $18,406.25 in attorney's fees and costs/expenses in the amount of $2,412.13 for the employer's arbitrary and capricious handling of this matter.
We affirm the judgment insofar as it awards the claimant compensation benefits from the date of injury to September 19, 1995. We reverse the judgment insofar as it awards claimant SEBs. We reverse that part of the judgment requiring defendant to pay for all psychiatric treatment and prescriptions. We reverse the award of penalties and attorney's fees, finding that the City of Kenner did not handle this matter in an arbitrary and capricious way.
Chateau was employed with the City of Kenner as a waste water plant operator for the night shift. He also held (and continues to hold) a full-time day position with the Jefferson Parish School Board as head custodian at Riverdale High School in Jefferson. On June 16, 1995, Chateau was performing his duties at the waste water plant when he tripped over an extension cord, spraining his left knee and sustaining a soft tissue injury of his left foot.
Chateau was treated by his longtime orthopedist, Dr. J. Lockwood Ochsner. According to the medical records, this orthopedist has treated Chateau since at least 1989 for various injuries and complaints of knee and leg pain. Dr. Ochsner diagnosed a sprained knee and sprained foot. X-rays taken revealed a non-union fracture of the third metatarsal in the left foot, which Dr. Ochsner opined was an old injury. Dr. Ochsner checked this finding by looking at an X-ray of Chateau's foot from 1993, which showed the same aged fracture. Dr. Ochsner testified that the foot injury was more significant than the knee injury, although both were minor injuries. He found that within three months of the injury, Mr. Chateau's foot and knee injury had resolved, and that he had reached maximum medical improvement and had returned to his pre-injury level of functioning.
Two weeks after Chateau's injury, the waste water treatment section of the City of Kenner was privatized. The PSG Company took over all positions in the plant. The fact of the impending privatization was well known to the plant employees prior to the July 1, 1995 date. Chateau applied for other night positions with the City of Kenner, but none exist. He also applied at PSG for his old position, but was not hired.
Chateau received workers' compensation benefits from the City of Kenner until August 18, 1995. Additionally, Chateau was maintained on his health insurance, Ochsner HMO, that he received through the City of Kenner, for one additional year after the privatization (until July 1, 1996).

Standard of Review
In a worker's compensation case, as in other cases, we are bound by the manifest error rule and we may not set aside the factual findings of the hearing officer absent a finding by this court that they are clearly wrong or manifestly erroneous. Rivera v. West Jefferson Medical Center, 96-152 (La. App. 5 Cir. 7/30/96), 678 So.2d 602.

Compensation Award
The hearing officer's judgment awards Chateau all compensation benefits from the date of the injury (June 16, 1995) until September 19, 1995. On the latter date, Dr. Ochsner approved two positions that the rehabilitation counselor found for Chateau. The City of Kenner had stopped compensation on August 18, 1995, based upon Dr. Ochsner's report of July 25, 1995 that stated Chateau's injuries were healing and the doctor *259 expected the injuries to fully resolve and Chateau to return to preinjury levels of functioning within three months of the accident. This report also stated that Chateau could return to light duty work. Because it was not until September 19 that Dr. Ochsner approved job positions for Chateau, we find that compensation should have been paid through this date. However, we do not find Kenner arbitrary and capricious for ending compensation when it did. Dr. Ochsner has treated Chateau for many years for problems with his knees and legs, and Kenner was entitled to rely on the opinion of this treating physician. According to Dr. Ochsner's subsequent reports, Chateau's condition did in fact resolve in three months. See Bynum v. Good News Const., 96-41 (La.App. 5 Cir. 5/28/96), 675 So.2d 1203, writ denied, 96-1693 (La.10/4/96), 679 So.2d 1388.

SEBs
The judgment awarded claimant SEBs, as per LSA-R.S. 23:1221(3), finding Chateau could not return to work at 90% or greater wages that he earned from the City of Kenner at the time of the accident. A workers' compensation claimant seeking SEBs bears the burden of proving, by preponderance of the evidence, that the work related injury resulted in his inability to earn wages equal to 90% or more of wages at the time of the injury; such is determined by the facts and circumstances of each individual case. Kortz v. Colt Energy Services, Inc., 97-159 (La.App. 5 Cir. 7/29/97), 698 So.2d 460. We find that plaintiff failed to bear this burden. We further find that the hearing officer's conclusion is unsupported by the record and is manifestly erroneous.
Chateau began counseling with Glenn-Mar rehabilitation services in August of 1995. In September, they identified six jobs that Chateau could perform with his physical restrictions. On September 19, 1995, Dr. Ochsner specifically approved two of these positions (but did not specifically disapprove the others). Chateau, however, refused these positions because he did not want to work as a telemarketer or a night dispatcher with the City of Kenner.
Chateau testified in his deposition that he holds an electrical license and is qualified to do electrical work, and has in fact performed several electrical jobs since the June 16, 1995 injury. In his deposition, he also stated he is physically able to work. Chateau felt that Kenner was not being fair to him. He felt that Kenner should give him a groundskeeper's job at the playgrounds.
Chateau's claim that he is entitled to disability benefits is suspect since he is employed full time as a school custodian. Chateau's job descriptions at the waste water plant and the job description of his school custodian job were entered into evidence. These job descriptions are very similar in their physical requirements, with the physical demands at the school board actually reading slightly more demanding. Chateau testified that as head custodian, he mostly sat at a desk and delegated the physical work to other employees. However, his statement was contradicted by his medical records. Those records show that in January of 1995, he sustained a workers' compensation back injury (sciatica) at Riverdale while moving a 400 pound locker unit. Chateau was absent from his custodian job for approximately 6-8 weeks with this injury.
On April 15, 1996, Dr. Ochsner returned a questionnaire to Loretta DeSoto, a medical case manager with Med/Voc, regarding Chateau's condition. In that document, he stated that the fall of June 16, 1995 aggravated the old non-union fracture of the fifth metatarsal in the left foot. He also stated that the fall aggravated previous arthritic conditions of the knees, but that the acute injury to the knee had resolved. Dr. Ochsner said that Chateau had no impairment ratings in the foot or the knee related to his injuries of June 16, 1995. The questionnaire asked Dr. Ochsner to separate the injury-related impairment ratings from pre-existing or unrelated conditions such as the obesity and degenerative arthritis mentioned in his previous reports. Dr. Ochsner stated that the fall of June 16, 1995 did not cause the patient's present condition, and the injuries of that date do not prevent him from working. Finally, the doctor confirmed that he had discharged Chateau from his care, as it was his opinion that he had reached maximum medical improvement and that his problems now *260 relate to his morbid obesity and degenerative arthritis. The doctor's deposition testimony reflects the same conclusions. Dr. Ochsner stated that prior to the June 16, 1995 injury, he would have advised Chateau of the same limitations as after the accident, that he should avoid climbing ladders, stooping, or kneeling. Chateau also admitted that Dr. Ochsner never told him that his current medical condition is related to the fall of June 16, 1995.
Chateau testified that he fishes, goes to Mardi Gras parades, he drives around all the time in his truck and repairs his truck. He testified that he can't coach his kids' teams anymore. He has applied for night jobs with the City of Kenner, but none exist.
In his deposition, when asked about his present limitations, Mr. Chateau stated:
I could do anything. Look, if they wanted to be fair, they could give me a job over there at the darn recreation department heading up the recreation department. It don't even have to be the boss. Go ride the scooter around, go pick the little bases up, turn the lights off and all. Come on, man, I'm still good. They could do right by me, Mr. Maxwell. They could do right by me.
I can't carry heavy, heavy loads no more, but I can still carry, I can still walk, I can still bend over. My back is strong. I'm still a great individual, man, and I'm trying to hold up through all of this. There is something Kenner can do for me, Mr. Maxwell. That's all I'm asking for. Be a little fair with me. Find me a darn grounds keeper job. I'm not asking for anything else.
Chateau admitted to taking over 200 days of sick leave with the City of Kenner right before this accident. He stated that he had to "use it or lose it" and that he wasn't going to "give" it to them, due to the impending privatization. He admitted performing ten electrical jobs that he filed with the City of Kenner after this accident. He stated that he didn't need to climb a ladder to screw in a light bulb, as he is 6'10½" (medical records show a range of height from 6'5" to 6'6½"). He stated that he can do any kind of work if he can sit down or stand up and move his legs around.
On redirect, he stated that he can't stand or walk for long periods of time, he can't sit too long, and he has to constantly move his feet. He stated that Dr. Ochsner knew before June 15, 1995 what he did for a living. He admitted that Dr. Sommerville, his primary care physician with Ochsner HMO[2], told him before June 15, 1995 not to climb, but he does because he has a family to take care of. He introduced into evidence a prescription Dr. Ochsner wrote him in 1997 for a scooter type cart and motorized lift as evidence that his condition is deteriorating.
Dr. Ochsner clearly testified that Chateau's injuries may have aggravated his condition, but that they were minor and were resolved within three months. He also clearly stated that Chateau's current problems and limitations were directly related to his well-established and pre-existing severe degenerative arthritis of the knees and not the fall of June 16, 1995, and that his condition would continue to degenerate with time. Additionally, this court viewed a videotape made in January and February of 1997 that shows claimant standing, bending, and kneeling down to work on his truck. Finally, we note that Chateau continues to hold a full time position as head custodian at Riverdale High School, the job description of which is as physically demanding as the job description of waste water plant operator with the City of Kenner.
Accordingly, we find that Chateau failed to bear his burden of proof that he cannot engage in employment equal to 90% of his pre-accident wages. He clearly states that he can "do anything." He has skills and licenses (the electrical licenses). It appears that the main reason Chateau did not return to the waste water plant was the privatization, not because of job restrictions, which Dr. Ochsner testified would be the same both before and after the accident. Chateau also *261 demands a specific position with the City of Kenner. However, Kenner does not have the obligation to furnish a workers' compensation claimant with the specific job of the claimant's choice. Therefore, the awards of SEBs is reversed.

Psychological Injuries
Kenner argues that Chateau did not sustain a psychological injury as a result of his fall on June 16, 1995. Chateau claims psychological injuries related to his fall, as distinguished from psychological disability, which he does not claim.
The claimant had an extensive history of medical problems and injuries to his knees and legs. Chateau also has an extensive history of psychological and psychiatric illnesses. In 1989, he exhibited symptoms of anxiety, poor appetite, hopelessness, and revenge after being fired from a position with FNBC. During that same year, Chateau was hospitalized at Ochsner Hospital for a six week drug detoxification, necessitated by his addiction to prescription painkillers taken for chronic knee and leg pain. Chateau successfully completed the program.
Chateau entered a chronic pain management program at the recommendation of Dr. Morris Burka, a psychologist with whom he was treated after his accident. Dr. Burka stated in his deposition that Chateau was referred to him by Dr. Sommerville, claimant's treating physician. Claimant first saw Dr. Burka on September 25, 1995 (one week after Dr. Ochsner approved two job positions, and one month after compensation benefits were discontinued). Dr. Burka, a licensed psychologist, stated in his deposition that he saw Chateau for a limited time on a sort of emergency basis. He also stated that Chateau told him that his life was fine until he lost his job after the June 16, 1995 accident. Hence, Dr. Burka related Chateau's depression and pain to this accident.
However, the extensive medical records show that Chateau was not forthcoming with Dr. Burka about his extensive medical and psychiatric history. These records show that claimant omitted mention of his past psychological history of depression and inability to deal with his physical medical problems, and of his many physical problems and injuries. He did tell Dr. Burka of his 1990 addiction and treatment. Chateau's medical records indicate that he has a past history of several years of chronic pain, since at least 1989, due to the severe degenerative arthritis of his knees and the history of deep vein thrombosis in his legs. Dr. Burka admitted that he did not review any of Chateau's previous medical records, nor did he receive any history other than what Chateau told him. He did not administer any psychological or diagnostic tests to Chateau.
Dr. Burka's conclusion, that claimant's depression was directly consequent to his June 16, 1995 injury, was based entirely on the incomplete history given to him by Chateau. Dr. Burka's opinion is compromised by Chateau's failure to report his complete medical history. With the incomplete medical and psychiatric history, Dr. Burka necessarily had to conclude that Chateau's condition was related to his work accident, because he had no other information from the claimant. But this court has the benefit of Chateau's complete medical history, which Dr. Burka did not. It is the conclusion of this court that Chateau's accident did not cause the chronic pain for which he was treated at Ochsner's pain management clinic, nor did it cause Chateau to be psychologically or psychiatrically injured.
Dr. Burka saw Chateau again in March, 1996, because the pressure of "looming legal battles" was getting to him and he feared being able to handle it. This is not the type of depression that is compensable under workers' compensation scheme.
Dr. Burka admitted that he never got to know Chateau well. The last time Burka saw him, according to his deposition, was May 7, 1996. Chateau was very discouraged about his medical problems and feared the possibility of having his legs amputated. However, the records do not show that amputation was recommended by Chateau's treating physicians. On being questioned by defense counsel, Dr. Burka stated that he did not know any details about what kind of accident Chateau suffered. Dr. Burka's records do not contain any diagnosis by any medical doctor that Chateau is disabled.
*262 Chateau was examined by two psychiatrists for the defense, Drs. Hannie and Roniger. Dr. Hannie reviewed Chateau's extensive medical records and the deposition by Dr. Ochsner. Among other tests, Dr. Hannie administered the Minnesota Multiphasic Personality Inventory-2, which is a standard and highly used diagnostic test, used for more than 50 years and interpretations are based upon more than 12,000 research studies. His findings indicate that the claimant did not suffer from any mental injury.
Dr. Hannie administered the Multidimensional Pain Inventory, which is an objective test for the assessment of chronic pain patients. Chateau's profile was classified as Dysfunctional. He indicated the maximum possible level of pain severity, which is significantly above that endorsed by the average chronic pain patient. However, Dr. Hannie noted that Chateau was far above average in social activities and outdoor work when compared to the chronic pain patient.
Dr. Hannie concluded that although Chateau endorsed an extremely large number of symptoms, he failed to evidence major depression. He noted that claimant holds a full time job, is actively involved with his family, and goes fishing and enjoys other activities. He opined that Chateau may be experiencing some unhappiness as a result of the loss of his job, this is not the same as depression that requires professional intervention. Dr. Hannie found no psychiatric disability.
Dr. Roniger, a psychiatrist, examined Chateau in his office on April 2, 1996. He found no psychiatric illness or disability.
In an April 15, 1996 questionnaire that Dr. Ochsner completed for claimant's case manager at Med/Voc, he stated that the fall of June 15, 1995 did not cause the patient's present condition, and that those injuries do not prevent him from working. He also stated that the psychiatric consultation was not initiated because of the work injury. In his deposition, Dr. Ochsner stated that Chateau's present condition was due to his pre-existing severe degenerative arthritis, which was progressive and would eventually make simple functions, such as walking, very difficult.
We find that the hearing officer was clearly wrong in finding that the City of Kenner liable for payment of any psychological or psychiatric treatment of Chateau.

Penalties and Attorney's Fees
LSA-R.S. 23:1201.2 allows for the imposition of reasonable attorney fees incurred in the prosecution and collection of a worker's compensation claim when the employer arbitrarily, capriciously and without probable cause fails to pay a claim or discontinues payment of claims due and arising under the chapter. Whether the employer's act is arbitrary, capricious or without probable cause depends upon the facts existing and known to the employer at the time its decision as to benefits was made. Bynum v. Good News Const., 96-41 (La.App. 5 Cir. 5/28/96), 675 So.2d 1203, writ denied, 96-1693 (La.10/4/96), 679 So.2d 1388. Statutes imposing liability for penalties and attorney fees are penal in nature and must be strictly construed to prevent an employer from being penalized for relying in good faith on valid defenses. Gagnard v. Venture Marketing Corp., 93-1655 (La.App. 3 Cir. 10/5/94), 643 So.2d 460.
Based on the above findings and reasons, we find that the hearing officer was clearly wrong in finding the City of Kenner arbitrary and capricious in its handling of Chateau's workers' compensation claim. As such, the award of attorney's fees must fall.
Likewise, the award of statutory penalties is without basis. Kenner relied on reports by Dr. Ochsner to end the claimant's compensation benefits on August 18, 1995. Although this is one month before Dr. Ochsner approved job positions for the claimant, Dr. Ochsner opined that Chateau had reached his maximum medical improvement and had returned to his pre-injury level of functioning three months after the accident. In all of his reports (July 25, 1995 and the letter of April, 1996), Dr. Ochsner has maintained this opinion. Therefore, while this court affirms the trial court's extension of benefits for one month through September 19, 1995, we find that Kenner was not arbitrary and capricious in its decision to end compensation on August 18, 1995 based upon Dr. Ochsner's report.
*263 Accordingly, for the reasons assigned above, we affirm the judgment insofar as it awards Arthur Chateau compensation benefits from the date of injury through September 19, 1995. We reverse all awards of SEBs. We reverse the awards of penalties and attorney's fees.
AFFIRMED IN PART, REVERSED IN PART.
NOTES
[1] This appears to be a typographical error on the part of the hearing officer. Both parties concede that lost wages were with the City of Kenner, not the Jefferson Parish School Board.
[2] Dr. Sommerville's name is spelled throughout the record as Sommerville, Somerville, and Summerville.